**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 4:23-CR-00718-ZMB |
| SIDDHARTH JAWAHAR, | ) | |
| Defendant. | ) | |

**DEFENDANT'S SENTENCING MEMORANDUM**

Comes now Defendant Siddharth Jawahar, by and through undersigned counsel, and respectfully submits this Sentencing Memorandum in support of his request that the Court impose a sentence of no greater than 48 months' imprisonment, which constitutes a sentence sufficient, but not greater than necessary to comply with the purposes set forth in 18 U.S.C. § 3553(a).

## I. OVERVIEW

Siddharth Jawahar came to this country at 17 with a scholarship and big dreams, but also with heavy baggage. He worked hard to put not just physical, but emotional distance between himself and his home country of India. He spent the next two decades building a life in this country. Part of that work included helping to build a legitimate investment fund, one that made real investments for real clients, and one that, for years, was working well. Unfortunately, when a single catastrophic investment collapsed, Mr. Jawahar made a series of terrible choices, which led to the trouble he is in today. He couldn't admit the truth of his failings to his investors, to his mentors, or to his parents… perhaps not even to himself. He took new money to cover old losses, dressed collapse in a costume of success, and in doing so, hurt many of the people who trusted him–to the tune of tens of millions. *See Presentence Report ("PSR")* ¶¶ 21, 91.

Nothing in this memorandum runs from that. Mr. Jawahar pled guilty, admitted the scheme in detail, and stands before this Court responsible for every dollar and every broken relationship behind it. The question at sentencing is not whether he did wrong. Rather, the question § 3553(a) asks is this: what sentence is *sufficient, but not greater than necessary*, to account for not *just* the worst decisions Mr. Jawahar has made; but to consider the totality of his life, his good works, his efforts to right these wrongs, and his future. *See* 18 U.S.C. § 3553(a). In order for the Court to meet the goals of sentencing, it must know three things the Government's memorandum does not explain:

*First*, this Court should consider why this happened. The Government reduces the entire set of circumstances to one word: "greed." *See Government's Sentencing Memorandum ("Govt. Memo")*, Doc. 123, at pp. 3–4. The record tells a far more complicated, and far more troubling story; one that certainly does not *excuse* the conduct, but does put it into proper context. It is a complicated story, one that only a qualified expert could begin to unravel. *See* Ex. A, *Report of Robin Zachary, LICSW* ("*Zachary Rpt.*").[1] The details of the abuse and trauma Mr. Jawahar endured early in life give context to his conduct, and perhaps more importantly, show why it will never happen again.

*Second*, this Court should know what Mr. Jawahar has done to make amends for his crimes. For roughly thirty months, in a contract jail that offered no educational programming of any kind, Mr. Jawahar built a system himself. He designed curricula by hand, tutored fellow detainees for the GED, and mentored men who arrived with only eighth-grade educations–but left with diplomas, shortened sentences, and jobs. *See, e.g., Short Video (to be shown at sentencing).* At the same time, he has worked to identify and liquidate the real investments that he made, approaching

[1]Robin Zachary is a trauma expert, a psychiatric social worker, and Clinical Social Worker who has a Harvard Medical School part-time faculty appointment. *See*, Ex. B, *Robin Zachary CV*.

$10 million that can hopefully go back to the very victims he wronged, if the right measures are undertaken.

*Third*, this Court must understand the "raw numbers" when it comes to what its ultimate sentence actually means. Because Mr. Jawahar is a deportable non-citizen, every month that this Court imposes is harsher than the same month imposed on a citizen standing in the same spot. He will receive no "FSA" credits, no minimum-security camp placement, no halfway house or home confinement, and months of additional detention when he finishes his BOP time as he will then be sent to immigration custody for removal proceedings. Of course, these proceedings will ultimately result in the final blow to his life's work–removal from the country that has been his home since he was 17 where he hoped to spend the rest of his life. *See* Ex. C, *Declaration of Shannon L. Race* ("*Race Decl.*"); Ex. D, *Letter of Mark A. Silverman, Esq., American Immigration Law Group* ("*Silverman Letter*").

The parties' plea agreement permits Mr. Jawahar to seek a sentence below the Guidelines range. *See* Doc. 104, at p. 2. For the reasons below and based on the statistical analysis in Part II showing that this request is squarely within the range of sentences imposed nationally on similarly situated defendants, Mr. Jawahar respectfully asks the Court to impose a sentence of no greater than 48 months' imprisonment, together with the maximum restitution the law allows, and the judicial recommendations set out in the Conclusion.

## II. UNRESOLVED OBJECTIONS TO THE GUIDELINES CALCULATION: LOSS IS LESS THAN $35 MILLION AND JAWAHAR QUALIFIES FOR USSG §4C1.1

### A. Loss is Less Than $35 Million

As the PSR correctly notes, Mr. Jawahar stipulated to a loss amount of at least $25 million for purposes of calculation in the Guidelines. The PSR claims that Mr. Jawahar is accountable for an amount in excess of $36 million. Mr. Jawahar, however, is entitled to credits against loss that would reduce the loss amount to $29.4 million. The PSR declined to award any credits to Mr. Jawahar citing USSG § 2B1.1, Application Note 3(E)(iv). But that Application Note only precludes credits that are "in excess of [an] investor's principal investment." There is no evidence that the value transferred by the $10+ million of investments and expenses were in excess of any investor's principal investment. Even if the majority were, as long as the Court finds that at least $1.6 million in credits are to be afforded to Mr. Jawahar, as the Guidelines otherwise direct, his loss amount would be less than $35 million.

While a loss of less than $35 million would not make a difference under the current iteration of the Guidelines, on November 1, 2026, an inflationary adjustment to the loss table will go into effect, raising the threshold for a +22 upward adjustment from $25 million to $35 million. Thus, any loss amount below $35 million would result in an upward adjustment of only 20. The Court may and should use the revised loss table for purposes of sentencing Mr. Jawahar. *See, e.g.*, *United States v. Taylor*, 648 F.3d 417, 425 (6th Cir. 2011) (holding that a "district court can consider subsequent amendments to the Guidelines for purposes of fashioning an appropriate sentence under the § 3553(a) factors"); *id.* at 427 ("[t]he amendments . . . 'bear[] directly on the District Court's overarching duty 'to impose a sentence sufficient, but not greater than necessary' to serve the purpose of sentencing") (citations omitted).

**B. Mr. Jawahar is Entitled to the Zero Point Offender Downward Adjustment.**

The PSR claims that Mr. Jawahar is not eligible for the two-level downward adjustment pursuant to U.S.S.G. § 4C1.1 because he personally caused "substantial financial hardship" to the

victims of the offense conduct. While Mr. Jawahar sincerely regrets and desires to fully atone for his conduct to the victims—something which he has steadfastly engaged in doing–there is no evidence cited by the PSR that shows Mr. Jawahar personally caused substantial financial hardship to any victim.

First, while, regrettably, the victims cited in the PSR suffered immense stress and some suffered substantial financial loss, there is no indication that any are suffering substantial financial ***hardship***. As U.S.S.G. § 2B1.1, comment. (n.4(F)) sets forth, examples of a victim suffering substantial financial hardship include becoming insolvent and/or declaring bankruptcy. As Judge Edward Davila of the U.S. District Court for the Northern District of California recently put it,

> the words 'substantial' and 'hardship' suggest that the victim's loss must be significant. Significance is a relative concept that only gains meaning from comparison, and '[t]he most natural point of comparison is the financial condition of the victim.' . . . Instinctually, the $450 million in losses here would seem to meet that definition. But this gut reaction is a poor measure at best. Losing one million dollars may not even register as a loss for certain victims, whereas for others it could result in complete financial devastation.

*United States v. Holmes*, No. 5:18-cr-00258, 2026 U.S. Dist. LEXIS 65138, *10-11, 2026 WL 836559 (N.D. Calif. Mar. 26, 2026) (citations omitted; quoting *United States v. George*, 949 F.3d 1181 (9th Cir. 2020)).

Second, to the extent any victims in fact are experiencing such hardship, the PSR does not identify a sufficient, proximate causal chain that would demonstrate Mr. Jawahar ***personally*** caused such hardship. *See United States v. Agbi*, No. 1:19-cr-0280, 2024 U.S. Dist. LEXIS 159011, *7 (S.D. Ind. Sept. 4, 2024) (holding in context of determining whether defendant personally caused substantial financial hardship for purposes of U.S.S.G. § 4C1.1, "[c]ausation involves two separate tests: but-for causation and proximate causation"); *id.* at *8 (finding defendant eligible

for USSG § 4C1.1 where victim would have suffered substantial financial hardship regardless of defendant's offense conduct).

Accordingly, consistent with the plea agreement, this Court should apply the two-level downward adjustment pursuant to USSG § 4C1.1. Thus, Mr. Jawahar's Total Offense Level is no more than 30.

## III. <u>THE HISTORY AND CHARACTERISTICS OF SIDDHARTH JAWAHAR & NATURE & CIRCUMSTANCES OF THE OFFENSE: 18 U.S.C. § 3553(a)(1)</u>

### A. Early Life

Siddharth "Sid" Jawahar was born in 1987 in a semi-developed corner of New Delhi, where, as he describes it, "100 feet in every direction people were living in huts." Ex. A, *Zachary Rpt.*, at p. 4. His father, a lawyer whose practice never prospered, was "forever trying to make ends meet"; his mother kept the home. *Id.* They were people of service, including thirty years in the Rotary Club, polio-vaccination camps, literacy projects, and more. *See, e.g.,* Ex. E, *Sentencing Letters.* They made a point to include their children in these efforts, instilling the importance of service in Mr. Jawahar from the youngest age. *Id.* But for all the positive his parents instilled in him, there was another, darker, side that cannot be ignored in this calculation.

In struggling to understand his own choices, Sid has done much introspection, and for the first time, brought to light something he had struggled to suppress—his severe childhood sexual exploitation and abuse at the hands of his maternal uncle. Ex. A, *Zachary Rpt.,* at p. 6. Beginning when Mr. Jawahar was a seven-year-old child, and continuing for years, that uncle groomed and sexually abused both him and his younger cousin. What started with "artistic" sketching sessions turned to forced nudity, spiked sodas, and undeniable, full-on sexual abuse. The uncle's recurring mantra, delivered in Hindi, *"kuch nahi hua", or* "nothing happened", like any ingrained trauma, carries forward and repeats over time. *See Id.* at p. 11. His parents could not protect him, because

they did not know. He could not tell them, because, in the family's culture, "any mention of abuse would be greeted with hostility." *Id.* at p. 5. Therefore, he learned a critical protective mechanism, dissociation, which Zachary describes as the nervous system's last defense. *Id.* at p. 6. In other words, in times of great stress, the mind and the body survive by tuning out and moving through the trauma.

**B. The Escape**

Mr. Jawahar survived the way gifted children of abuse often do--by achievement: debate captain, academic honors. He explains, "I knew I was headed out of India... The abuse by my uncle was the largest driving factor." Ex. A, *Zachary Rpt.*, at p. 13. Twelve colleges accepted him. Yale was unaffordable. The University of Texas at Austin ("UT Austin") offered a scholarship, and in 2005, he left everything he knew behind to begin an American journey, one he never would have predicted could have ended this way.

At UT Austin he flourished, by again putting his nose to the grindstone, over-achieving, and never forgetting the spirit of service his parents instilled. Among other things, he was a student ambassador for Face AIDS and Partners in Health, President of the University Investors Association. Ex. A, *Zachary Rpt.*, at p. 15; *PSR* ¶ 56. His achievements "reflected a driven, gifted immigrant's adaptive functioning within a highly competitive environment, rather than the absence of psychological injury." *Id.* at p. 3. The injury would always remain with him.

Another coping mechanism he found early, was alcohol. The brandy his uncle first poured into his soda evolved into a nightly bottle of wine, resulting in half-a-dozen overnight detox hospitalizations, and a conviction for drunk-driving, arising from a 2013 vehicle crash that this memorandum does not minimize: Mr. Jawahar drove into a storefront and fled on foot before being arrested. *PSR* ¶ 49. Mr. Jawahar was drinking daily, continuously, up until the day of his arrest in

this case. *PSR* ¶ 61. The Court hopefully understands this prior conviction and his addiction for what the clinical record shows them to be: symptoms of severe trauma–as opposed to character or morality flaws. "[S]elf-medication by alcohol or drugs is highly prevalent among abuse survivors to numb their distress." Ex. A, *Zachary Rpt.*, at p. 15. The 2.5+ years he has spent incarcerated thus far have been the greatest engine for sobriety, which will set the foundation for future abstinence and rehabilitation.

### C. Swiftarc: A Real Fund, Broken By a Catastrophic Bet

This case did not begin as a fraud. Swiftarc Capital was created in 2010 and registered as an investment adviser with the Texas Securities Commissioner in 2013. *PSR* ¶ 7. Between 2013 and 2016, Mr. Jawahar took in more than $14 million of investor money and *invested it*, in the PSR's words, "in a diverse array of securities." *Id.* For those years there were no fake statements, no Ponzi payments, no scheme. There was a young manager, a real fund, real clients, and, as always… a gnawing pressure to please and to achieve.

Then came the bet that broke everything. Beginning around 2015, Mr. Jawahar concentrated the fund's holdings, ultimately 99% of them, into a single overseas position, Philip Morris Pakistan. *PSR* ¶ 10. But the stock collapsed. The terrible choices Mr. Jawahar made after that are what constitute the crime for which he has admitted and accepted full responsibility. He knows he should have come clean and accepted consequences right then and there. But he opted for a disastrous "fake it 'till you make it" strategy, soliciting new investors to repay old ones, and the lie began feeding itself. *PSR* ¶ 10. From July 2016 through December 2023, that concealment metastasized into everything his plea describes.

As bad as those facts are, this Court knows there are factors that differentiate Mr. Jawahar's fraud from other similar fraud, including Ponzi scheme fraud. Indeed, typical Ponzi schemes are

designed from the outset to steal, with *nothing real* behind the marketing or the financial transactions. *See, e.g.*, *United States v. Merrill* (D. Md.) ($396 million scheme in which no underlying asset was ever purchased at all).[2] Mr. Jawahar built a real business and then committed a terrible crime to conceal its failure. While both types of offenders belong in front of a sentencing judge, they should not be considered equally culpable.

While the government offers a reductionist view of his bad decisions, the truth is that Mr. Jawahar did not commit these crimes out of greed or malevolence. Zachary's comprehensive analysis puts his failures in a more nuanced light. Mr. Jawahar's professional life was his identity, his armor, and his pride. It was organized around Frank Krasovec, the Swiftarc Ventures founder who called him his "second son." Ex. A, *Zachary Rpt.*, at p. 21. He admits his conduct was meant to please and protect his mentor, as well as to protect his own reputation he had worked so hard to build.

The clinical findings here are precise: A child who is taught that his survival depends on the approval of powerful men, and that catastrophe must be renamed ("nothing happened"), grows into an adult with a "significant psychological need not to fail," for whom "[c]onceding to failure would be essentially capitulating to the weak, abused child that he was." *Id.* at p. 4. When the house of cards fell down, the only proper response was one Mr. Jawahar had spent thirty years being trained never to say: *something happened, and it was bad.*

**D. The Government's "Greed Narrative" Further Debunked**

The Government's claim that the motivation for these crimes was simply "insatiable greed," Doc. 123, at pp. 1, 3–4, is not accurate. While it is true he admits to spending investor

[2] *E.g.,* DOJ Press Release, Oct. 10, 2019, "*Ponzi Scheme Promoter Sentenced to 22 Years in Federal Prison for $396 Million Scheme – The Largest Ever Charged in Maryland*," https://www.justice.gov/usao-md/pr/ponzi-scheme-promoter-sentenced-22-years-federal-prison-396-million-scheme-largest-ever.

money on "extravagant lifestyle expenses, including payments for flights on private planes, stays at luxury hotels, and expensive outings at lavish restaurants," it is also true that every dollar was spent in connection with Swiftarc business events. The planes were to shuttle investors to meetings, and the hotels and meals were in the context of investor meetings or solicitations. The high-end dinners, including the "Marble Room" steakhouse in the Government's greed-exhibit photo (Doc. 123, at p. 4 n.1), were for the business, not only attended by, but sanctioned by Frank Krasovec.[3]

Yes, the expenditures were inappropriate, as they were the wardrobe of a fund putting on airs for investors or potential investors. *But it does make it different.* What is *missing* from this record is the kind of true personal enrichment with extravagant spending on lifestyle expenses one almost always finds in a fraud involving this dollar amount. There is no mansion. There is no yacht. There is no Lamborghini, no jewelry collection, no Rolex watches, no million-dollar art hanging on the defendant's walls. The forfeiture inventory in this case consists of four venture-fund interests totaling $155,000 (investments, not toys), and the PSR's asset schedule confirms it. *PSR* ¶ 74. Mr. Jawahar lived in a relatively modest, rented apartment. He did not own a car. In fact, he poured his own savings into the business he was hoping to save. *See, e.g.,* Ex. A, *Zachary Rpt.*, at p. 22. This defendant, by the Government's own accounting, ended a nine-figure fraud effectively broke, with a net worth of $107,686. *PSR* ¶ 77.

**E. The Obstruction Enhancement: Conceded, and in Context**

Mr. Jawahar now concedes that the Government's evidence meets the burden for the two-level enhancement under U.S.S.G. § 3C1.1. *PSR* ¶¶ 22–25, 30. In the days after his arrest, he called

[3]Civil Action No. 25-1135-CFC-SRF, D. Del., Complaint, ¶ 87. The cause numbers are confusing in the civil action. It was originally filed in the Northern District of Ohio, under cause no. 1:25-cv-01135-CFC-SRF. It was eventually transferred to the District of Delaware, under Civil Action No. 25-1135-CFC-SRF. All documents referred to here are found on PACER under the Delaware cause number.

victim S.E. and told him to "be dedicated." He told his sister to try to wipe his iPhone. He was alleged to have made misstatements to pretrial services about his finances and immigration status. Rather than offer explanations or excuses, Mr. Jawahar will focus on one simple truth: these things happened during a short window of time immediately following his arrest and were made during a time of sheer panic and emotional turmoil. Thus, although under the letter of the guidelines, the burden for the enhancement is met, the context and, more importantly, the consequence, matters.

*It was a panic, not a campaign.* Mr. Jawahar was arrested on January 8, 2024, and the S.E. call came January 18. *PSR* ¶¶ 22, 27. Every obstructive act that the Government identifies occurred within only days of the arrest of a man whose entire psychological architecture, on this record uncontested, was built around concealing catastrophe. The obstruction was the crime's last spasm, not a new chapter.

*There was no functional obstruction.* The iPhone was already in the FBI's possession, its contents preserved. S.E. sat for his FBI interview and spoke freely. Indeed, the Government's own account confirms investigators learned of the call and its meaning directly from S.E. Doc. 121, at pp. 11–13. No evidence was lost, no data was wiped, no witness was silenced, and no proceeding was delayed.

[redacted]

[redacted]

## IV. REHABILITATION AND REDEMPTION

What follows is not the ordinary sentencing-season conversion story. It is in line with Mr. Jawahar's lifelong commitment to public service. Moreover, it signifies the thirty months of documented, witnessed, important work–performed in a facility that offers inmates zero educational programming.

### A. A Lifetime of Service and Character

The defense has received over 22 letters of support, submitted collectively as Ex. E, *Sentencing Letters*. The writers span every chapter, and nearly every continent, of Mr. Jawahar's life. Certain themes recur so consistently, from writers who know Mr. Jawahar from different decades and different worlds, that they cannot be dismissed as coincidence. The letters reflect the truth from people who know him best, who are fully aware of his crimes, and who are still standing by him, often because of the outsized influence he has had on their lives.

The record also reflects how Mr. Jawahar has taken the lessons his parents instilled in him, to serve those less fortunate, to heart. The list of his public service is long, including, but certainly not limited to:

- **Serving on the board of the Andy Roddick Foundation for approximately four years.** The mission of the foundation is providing after-school academic support, STEM training, and social-emotional mentorship to at-risk children in under-resourced neighborhoods. He directly participated in curriculum planning for STEM and youth leadership programs. Here, Mr. Jawahar helped manage the expansion of physical after-school centers into high-need neighborhoods, spearheaded major fundraising initiatives to keep programming fully funded during municipal budget shortfalls, and personally volunteered to mentor students enrolled in the foundation's summer programs. Ex. F, *Board Confirmation E-mail. See also,* Ex. J, *Photos of Mr. Jawhar Performing Community Service*.

- **Volunteering and mentoring with the "just keep livin" Foundation's after-school programs.** The mission of this foundation is to improve physical fitness, nutrition, and

mental health awareness for inner-city high school students. Mr. Jawahar volunteered at active school sites, led sessions on fitness and goal setting, helped coordinate fundraising and logistical events to scale program access to new public-school districts, and advocated for integrating mental health and emotional coping strategies into the foundation's core curriculum. *Id*.

- **He also volunteered for the Leukemia & Lymphoma Society ("LLS").** There he supported LLS's flagship "Man & Woman of the Year" campaign, helping advance specific cures and research for lymphatic glands removal aftermath in complicated cases of advanced lymphoma. He also fundraised directly for clinical research targeting childhood leukemia and raised emergency funds to help low-income families cover active treatment costs.

Given this long history of good works, it's not surprising that this manifested, in the most extraordinary fashion, in his current place of incarceration.

**B. Transforming Lives at Ste. Genevieve**

Since February 2024, Mr. Jawahar has been detained at the Ste. Genevieve County Detention Center, a contract facility that, as Bureau of Prisons expert Shannon Race confirms, offers detainees little recreation, limited visitation, and virtually no programming. Ex. C, *Race Decl.*, at ¶ 17. This is particularly problematic given that much of the inmate population is in need of education, vocational, and other programming to make real change in their lives. It simply did not exist, so Mr. Jawahar stepped up to fill that void.

Mr. Jawahar has spent thousands of hours creating and implementing individualized education and mentoring programs for his fellow inmates, many of whom have dropped out of school and/or never had a positive role model. Mr. Jawahar hand-drafts diagnostic tests, individualized lesson plans, curricula and problem sets, taking pains to copy them from a single donated GED study guide, too precious to mark up.

Through this work, he has served and changed the life of dozens of his fellow inmates. *See, e.g., Short Video* (to be shown at sentencing). Men who entered functionally illiterate passed the GED. A GED can be life-changing, especially for those headed next to the BOP. It lowers a

prisoner's security classification and recidivism score, multiplies First Step Act earned-time credits, and accelerates halfway-house placement. Men taught by Mr. Jawahar went home earlier, to better prospects, because of what they learned in a jail dorm. *Id*. For example, Reginald Smith arrived an eleventh-grade dropout. After roughly fifteen months of work with Mr. Jawahar, he passed his GED within months of reaching his BOP facility and is employed today. *See*, *Id.*

Mr. Jawahar's motivation for this work is the same as his work before his arrest, including the Rotary Club childhood, the polio camps, the AIDS ambassadorship, the after-school programs, the foundations. Mr. Jawahar finds meaning and happiness when he is in the service of others. The fact that he is still serving even in the darkest era of his life is nothing short of extraordinary.

**C. Efforts to Identify Assets and Make Pre-Sentence Restitution**

Mr. Jawahar's efforts to assist the government in identifying and recovering assets for liquidation and repayment of restitution have been extraordinary. For most defendants, restitution happens much further down the road, if at all. Like his work inside the facility, Mr. Jawahar has treated asset recovery as another full-time job.

Working with forensic accountants at Grant Thornton, with counsel from Foley Lardner, and most recently with undersigned counsel, Mr. Jawahar has identified to the government the surviving investments with recoverable value. Ex. H, *Executive Summary by Grant Thornton Bharat LLP*, at p. 1. Among other things, Grant Thornton analyzed the total investments made by Swiftarc and Mr. Jawahar personally and the current indicative valuations of those investments. Grant Thornton analyzed the top five portfolio holdings and determined their indicative valuation to be in the range of $9.8 million.. *Id.*

While there are no guarantees, it appears that through Mr. Jawahar's proactive efforts, it may be possible to recover several million dollars through the liquidation of these investments to

place into escrow for purposes of restitution. Absent Mr. Jawahar's diligent involvement, and the comprehensive roadmap to recovery he created, these assets would likely remain illiquid and unavailable to victims.

Undersigned counsel has been in contact with Marex Prime Services to obtain broker statements and supporting documentation substantiating the PMP investment. Marex has confirmed that Swiftarc does indeed hold the approximate number of shares on account and that the tender is open. Marex has advised that it would be in a position to liquidate Swiftarc's investment if it obtains appropriate assurances from a court or the government. Ex. I, *Email from Marex Lead Counsel, dated August 17, 2026*. The tender offer deadline of September 29, 2026, provides a defined window within which this liquidity event must be consummated, and Mr. Jawahar has, to the best of his abilities, been working diligently to complete the necessary steps to tender Swiftarc's shares before that deadline.[4]

**D. Helping Others Learn From His Mistakes**

While detained, Mr. Jawahar has also forged a relationship with Dr. Tim Hedley, from the Responsible Business Center at Fordham University's Gabelli School of Business. He has done a deep dive with Dr. Hedley on the precise failures at the center of his own offense and how people and institutions can prevent it. Ex. G, *Letter from Dr. Tim Hedley*.

This is a hallmark not only of Mr. Jawahar fully coming to terms with the gravity of his crimes, but also a man determined to help deter future would-be fraudsters from walking the same path. Again, Mr. Jawahar is doing far more than "talking the talk." This is yet another example of him showing up and working hard to help foster meaningful change. He will undoubtedly continue this work long after sentencing.

[4] The parties have also been actively engaged to liquidate the SpaceX holdings, but in full candor, those negotiations remain ongoing, i.e., no terms or agreement for sale or liquidation have yet been reached.

## V. THE PURPOSES OF SENTENCING: 18 U.S.C. § 3553(a)(2)

### A. A Sentence of No Greater than 48 Months is Sufficient

As set forth in Part II above, Mr. Jawahar contends his Total Offense Level is no greater than 30. Pursuant to the U.S. Sentencing Commission's Judiciary Sentencing Information (JSIN) platform,[5]

> During the last five fiscal years (FY2021-2025), there were 121 defendants whose primary guideline was §2B1.1, with a Final Offense Level of 30 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure. . . [T]he average sentence imposed was 76 month(s) and the median sentence imposed was 78 month(s).

JSIN further reports that only 20% received a within range sentence. The average and median sentences alone do not give an indication of how widely or narrowly sentences are distributed around those statistics. Accordingly, the histogram attached as Exhibit _ illustrates the distribution of these 121 sentences by one-year increments[6]—a wide distribution as it turns out, that indicates the Guidelines played very little role in the actual sentence ultimately imposed.

As shown, five defendants matching the selection criteria received a sentence of a single day (0.03 months) or less. Three individuals received a sentence greater than a single day, but no greater than 24 months, and so on. Fully 27 defendants, or more than one out of every five, received a sentence of 48 months or less. Exhibit K, *JSIN Histogram*.

### B. As a Non-Citizen, Mr. Jawahar Will Serve Significantly More BOP Time

As a deportable alien, Mr. Jawahar will serve significantly more time in the BOP than a U.S. citizen receiving the same sentence would serve. The Bureau of Prisons will attach a

---

[5] JSIN can be accessed here: https://jsin.ussc.gov/.
[6] The undersigned utilized the services of SentencingStats.com, Inc. for this analysis.

"Deportable Alien" public-safety factor to Mr. Jawahar. The consequences, detailed by a 25-year veteran of the BOP's Designation and Sentence Computation Center, are mechanical and unavoidable. *See* Ex. C, *Race Decl.* Though Mr. Jawahar's risk score qualifies him for a minimum-security, camp-eligible placement, he will not receive that privilege. Instead, the BOP will place him in at least a Low custody facility. *Id.*, at ¶ 6. He will be ineligible for halfway-house placement entirely, and he will not have the ability to apply the First Step Act credits that would have dramatically reduced his sentence. *Id.*, at ¶¶ 6–14.

The bottom-line differentials are stark. On identical sentences, Mr. Jawahar "will spend *nearly twice the time* in a BOP facility as a similarly situated U.S. citizen." *Id.*, at ¶ 16. Indeed, the chart on page 7 of Ms. Race's declaration shows that when factoring in FSA, RDAP, halfway house, and home confinement credit that would almost certainly be afforded to a similarly sentenced citizen, his sentence could actually be *three times* as long. *Id.*, at p. 7.

After release from his extended stay in the BOP, Mr. Jawahar will continue his incarceration, as he will be immediately taken into immigration custody and placed in removal/deportation proceedings. *Id.*, at ¶ 24. Removal is not speculative. Immigration counsel's opinion, based on the conviction and FOIA-obtained immigration records, is that Mr. Jawahar will be placed in removal proceedings, likely detained an additional *six to twelve months* by ICE after his sentence, and then ultimately removed. Ex. D, *Silverman Letter.*

Deportation will return him to a country he fled at seventeen, a place the clinical record shows he cannot even see depicted on film without being thrown back into traumatic re-experiencing. Ex. A, *Zachary Rpt.*, at p. 20. Courts have recognized deportation and its attendant consequences as relevant to what quantum of imprisonment is "just." *See*, *United States v. Aguilar-Perez*, 459 Fed. Appx. 791, 793 (10th Cir. 2012) (noting that district court stated that it would

"'vary downward by six months to take into account [Mr. Aguilar-Perez's] ICE detention . . .'"). While these consequences are his own, they also represent aspects of enhanced punishment that must fairly be considered here.

**C. Conditions of Confinement at Ste. Genevieve**

As of sentencing, Mr. Jawahar will have spent roughly 982 days--well over 2.5 years--in custody at a county contract jail. As previously stated, this facility lacks any meaningful programming and recreation options. Mr. Jawahar reports ongoing respiratory and skin conditions from the facility's air quality and mold, for which he is medicated. *Id.*; *PSR* ¶ 58. Research published by the federal judiciary's own journal finds that detained defendants are dramatically less likely to receive downward variances than released defendants. That is not because judges punish detention. It is because detention silently strips a defendant of every opportunity to *show* rehabilitation. Ex. C, *Race Decl.*, at ¶¶ 21–23 (citing DaGrossa & Muller, *Federal Probation* (Dec. 2021)). Miraculously, Mr. Jawahar bucked those odds and built a solid rehabilitation record from inside a county jail.

**D. Deterrence: The Message Has Been Sent**

The Government argues that white-collar crime is a "prime candidate for general deterrence" and that only a Guidelines sentence will make the point. Doc. 123, at pp. 8–9. The empirical record says otherwise, *see supra*, Sec. II., clearly demonstrating the requested sentence has been shown, across the country, to meet the goals of sentencing, including deterrence. Moreover, the Government's own research tells the true tale.

The Department of Justice's National Institute of Justice summarizes five decades of research in five findings, the first two of which decide this issue: "The certainty of being caught is a vastly more powerful deterrent than the punishment," and "[s]ending an individual convicted of

a crime to prison isn't a very effective way to deter crime" beyond the fact of apprehension and conviction itself. Nat'l Inst. of Justice, *Five Things About Deterrence* (2016).[7] Increases in sentence *severity*, the only variable at issue between 48 months and the Government's request, produce, at most, marginal deterrent returns.

One might further question the Government's claim that such a severe sentence is necessary to deter white collar offenders, when it considers the disposition in another of this AUSA's fraud cases, *United States v. Mark Erney*, No. 4:25-cr-00056-RWS (E.D. Mo.). In that case, the defendant and another were charged with defrauding their employers of almost 1.5 million dollars. While this is obviously a lower dollar amount, it was not Mr. Erney's first offense.[8] The recent spate of federal pardons for federal fraud and other defendants further undercuts the Government's position. To date, this administration has inexplicably granted pardons to white collar defendants, some repeat offenders.[9] The deterrence argument becomes a thin reed with so many other examples of disparate treatment to point to, most of which involve federal defendants who have committed similar or even far more serious offenses but have received significantly less punishment.

In any event, when considering the true consequences for Mr. Jawahar, the Government's deterrence rationale falls apart: a defendant caught, convicted, jailed for nearly three years before sentencing in a county facility, stripped of his career, his licenses, his reputation, his assets, his liberty, and ultimately his country, with a restitution judgment that will follow him for life.

---

[7]https://www.ojp.gov/pdffiles1/nij/247350.pdf.
[8]According to news reports, he had pled guilty twelve years earlier to almost the exact same criminal conduct. https://www.stlmag.com/news/mark-erney-sams-steakhouse-diversion/.
[9]Former Pardon Attorney Liz Oyer has been tracking pardons and clemency on her Substack. She notes that in this term, the administration has used the clemency power to wipe out prison sentences, restitution, fines, and forfeitures totaling over $1.5 billion. https://www.lawyeroyer.com/p/trumps-year-one-pardons-have-erased. The list is too exhaustive to include here, but suffice it to say, some of the cases, all gleaned from the DOJ pardon website, involved fraud cases amounting to *hundreds of millions of dollars*. https://www.lawyeroyer.com/p/pardon-trackers.

## VI. <u>CONCLUSION</u>

For all the reasons stated above, Mr. Jawahar respectfully requests that the Court impose a sentence of no greater than 48 months' imprisonment, restitution as required by law, and no fine given his documented inability to pay, *PSR* ¶ 77, together with the following recommendations to the Bureau of Prisons: (1) ***designation to FCI Elkton, Ohio,*** *near his family support system* (Caroline Tredway), Ex. C, *Race Decl.*, at ¶ 26; (2) participation in the Residential Drug Abuse Program; and (3) mental-health programming, including trauma-focused treatment.

RESPECTFULLY SUBMITTED,

Dated: September 7, 2026

***/s/ Doug Passon, Esq.***

Douglas Passon #017423(AZ)
Attorney for Defendant Siddharth Jawahar
Law Offices of Doug Passon, PC
10565 N. 114th Street, Suite 101
Scottsdale, Arizona 85259
Phone: (480) 448-0086
Email: doug@dougpassonlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of September, 2026, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon Assistant United States Attorney Derek J. Wiseman and all counsel of record.

*<u>/s/ Doug Passon, Esq.</u>*